PEOPLE *v.* CAMPBELL

1. Criminal Law—Place of Offense—Jurisdiction—Venue—Fact Question.

   The location at which a criminal offense occurred and, therefore, whether the trial court had jurisdiction over the matter is a question of fact for the jury to decide.

2. Criminal Law—Jurisdiction—Venue—Homicide—Evidence.

   Recorder's Court in Detroit had jurisdiction of a prosecution of defendant for murder where there was ample evidence from which the jury could reasonably infer that defendant's mother was murdered within Detroit.

3. Criminal Law — Right to Counsel — Warning of Rights — Waiver.

   A statement that there was no way of giving the defendant a lawyer but that one would be appointed if and when the defendant went to court coupled with the advice that the defendant could stop answering questions at any time until he had talked to a lawyer and giving the defendant a waiver form stating that the defendant did not want a lawyer, was willing to answer any questions and make a statement, and that the defendant knew and understood what he was doing were sufficient to advise the defendant of his right to counsel, the right to remain absolutely silent and answer no questions at all, and contained a fair explanation that the defendant could waive counsel and answer questions voluntarily.

---

References for Points in Headnotes

[1]  53 Am Jur, Trials § 277.
    21 Am Jur 2d, Criminal Law § 383 *et seq.*
[2]  21 Am Jur 2d, Criminal Law § 383 *et seq.*
[3]  29 Am Jur 2d, Evidence §§ 555–557.
[4]  29 Am Jur 2d, Evidence § 543 *et seq.*

4. CRIMINAL LAW—CONFESSIONS—VOLUNTARINESS.

The trial court did not err in determining that a confession was neither coerced nor compelled where the defendant was aware of his rights from the moment of his arrest, twice waived his rights in writing, the interrogating officer determined that the defendant could read, the defendant was not shackled in any way, he was asked if he wanted Cokes, and was allowed to smoke cigarettes during his interrogation.

Appeal from Recorder's Court of Detroit, Henry Heading, J. Submitted Division 1 June 12, 1970, at Detroit. (Docket No. 7,732.) Decided August 25, 1970. Leave to appeal denied October 29, 1970. 384 Mich 774.

William Larry Campbell was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Angelo A. Pentolino,* Assistant Prosecuting Attorney, for the people.

*Norman L. Zemke,* for defendant on appeal.

Before: HOLBROOK, P. J., and R. B. BURNS and O'HARA,* JJ.

O'HARA, J. This is an appeal of right from the denial of a motion for a new trial. Defendant was charged with, and jury convicted of, the crime of first-degree murder.[1]

We recite the relevant facts. In March of 1967, Margaret Churan, the mother of the defendant, was

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

[1] MCLA § 750.316 (Stat Ann 1954 Rev § 28.548).

strangled to death. Defendant at that time was en-
amored of and keeping company with a certain
Mary Dotson. Mrs. Dotson originally came from
Tennessee. She was the mother of several children
who lived with her in Detroit. Defendant lived in
Hamtramck. Mrs. Dotson wanted to return to her
mother's home in Tennessee. Defendant offered to
drive her there. To do so, he had to have the use
of his mother's car. Defendant, Mrs. Dotson, and
her children came to the deceased's home with the de-
fendant to get permission to use the car. It was
refused. An argument ensued. During the argu-
ment, according to Mrs. Dotson, the defendant in-
structed her to take her children upstairs and to re-
main there until he called her to come down. He
did not do so for a considerable period of time.
While she and the children were upstairs, Mrs. Dot-
son heard a door close and someone, presumably the
defendant, leave the home. Sometime later he re-
turned. He told her he was ready to take her to
her mother's home. Before leaving he elicited her
aid in carrying a heavy trunk from the house and
putting it in his mother's car. They left and arrived
at Mrs. Dotson's mother's home around nine the
next morning. Mrs. Dotson's children were left at
the grandmaternal home. Mrs. Dotson and defend-
ant drove some 12 miles out into the back country.
Defendant removed the trunk from the car. Accord-
ing to Mrs. Dotson, when he raised the lid on the
trunk she saw a hand. She started to run away.
Defendant allegedly restrained her and told her to
get back in the car. Defendant then poured gasoline
on the trunk and ignited it.

Some time later defendant was arrested in Brad-
ley County, Tennessee, by Tennessee authorities on
a fugitive warrant for escape from a South Caro-
lina workhouse. During confinement and interro-

gation in connection with that charge, he confessed to the murder of his mother.  He was then taken to McMinn County, Tennessee, the county in which the body was found.  While in McMinn County, defendant, in the presence of the McMinn Sheriff and two newspapermen, confessed again.  During a subsequent trip to McMinn County, defendant stated in a televised interview that he would plead guilty to the murder of his mother.

He was returned to Michigan and tried in Recorder's Court for the City of Detroit, and convicted as previously noted.  During the trial he repudiated his confessions.  He claimed Mrs. Dotson, in fact, strangled his mother.  He testified that on the night of the murder both his mother and Mrs. Dotson had been drinking; that there was ill feeling between them; and that he had confessed only to shield her, Mrs. Dotson, and her children from complicity in the crime.

The jury apparently accepted Mrs. Dotson's version of the grisly events and rejected defendant's.

On appeal, defendant raises three issues:

(1) That his confession was improperly admitted as being obtained in violation of his basic Fifth and Sixth Amendment constitutional rights, particularly as to his right to counsel and his alleged waiver thereof; (2) that his guilt was not established beyond a reasonable doubt; and (3) that there were insufficient facts adduced to vest jurisdiction of the prosecution in the Recorder's Court of the City of Detroit.

We treat the assignments of error in inverse order.

(3) Jurisdiction need not be proved with computerized accuracy.  There was ample evidence from which the jury could reasonably infer that the offense was committed within the City of Detroit.  To

hold otherwise would place upon the prosecution in
every criminal proceeding the impossible burden of
producing an eyewitness capable of testifying to the
event or events constituting the offense and the pre-
cise location at which they took place. Those guilty
of criminal conduct are not always sufficiently co-
operative to provide witnesses for this purpose. It
may in fact be said that in most cases they seek
to avoid furnishing such testimony. The assign-
ment of error is totally without merit.

"During the trial the defendant strenuously con-
tended the alleged offense occurred within the cor-
porate limits of the city of Detroit. There was testi-
mony on the part of the people in contradiction of
this contention that the alleged offense occurred in
Highland Park. The trial judge correctly covered
the matter in his instructions, specifically telling the
jury this was a question of fact for them to resolve.
Obviously, from the verdict, they found the crime
to have been committed in Highland Park." *People*
v. *Ragland* (1968), 14 Mich App 425, 427.

(2) There was ample testimony if believed by the
jury to support its finding of defendant's guilt be-
yond any reasonable doubt. Citations and record
excerpts in support of this holding would add noth-
ing to our obvious conclusion from the total record.
A fact issue was clearly created. The jury resolved
it. It is not susceptible of our review. *People* v.
*Heard* (1969), 19 Mich App 516; *People* v. *Arither
Thomas* (1967), 7 Mich App 103.

(1) We turn next to the first claimed error,
namely, that defendant was inadequately advised
of his constitutional rights and that if so advised
he did not expressly waive the right to counsel be-
fore being questioned.

The warnings were given to him in the following manner. He was presented with a printed card reading:

"Your rights: Bradley County, Tennessee. Date: 4/19/67. Time: 7:08 P. M.

"Before we ask you any questions, you must understand your rights. You have a right to remain silent and anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and have him with you during the questioning. You have this right to advice in the presence of a lawyer, even if you cannot afford to hire one. We have no way of giving you a lawyer, but one will be appointed for you if you wish, if and when you go to court.

"If you wish to answer questions at anytime, you also have the right to stop answering at anytime until you talk to a lawyer. This is the waiver: I have read the statement of the rights shown above and I understand my rights and what they are, and I'm willing to answer any questions and make the statement. I do not want a lawyer, and I understand and know what I am doing.

"There have been no promises or threats made to me, and no pressure of any kind has been used against me."

While the wording of the printed *Miranda*[2] warning contains some statements that might be termed ambiguous, the basic rights guaranteed by *Miranda* were sufficiently explained. Defendant specifically complains of the phrasing: "We have no way of giving you a lawyer, but one will be appointed for you if you wish, if and when you go to court."

Standing alone, this statement might offend against *Miranda,* but we think it must be read in light of this additional language:

---

[2] *Miranda* v. *Arizona* (1966), 384 US 436 (86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974).

"If you wish to answer questions at anytime, you also have the right to stop answering at anytime until you talk to a lawyer."

Then follows the waiver language on the form which defendant signed:

" * * * I'm willing to answer any questions and make the statement. I do not want a lawyer and I understand and know what I am doing.

"There have been no promises or threats made to me and no pressure of any kind has been used against me."

The quoted language may not be a triumph in precision of expression but we think it could not fail to advise the defendant of his right to counsel, the right to remain absolutely silent and answer no questions at all, and that it contained a fair explanation that he could waive counsel if he wished and answer questions voluntarily.

The foregoing interpretation is buttressed by the finding of the learned trial judge who conducted a most extensive and searching hearing on the issue of the voluntariness of the confession. The record consists of three volumes of testimony, the arguments of counsel, and the specific findings of the court. On the basis of that record, he excluded the inculpatory statements and the signed confession which were taken in the McMinn County jail. The trial court in effect held that while the warnings and waiver in that county comported with *Miranda* standards, they were tainted by the presence of reporters who took their own notes as the defendant confessed, and further tainted by the defendant's television appearance in which he publicly confessed his guilt. The court warned the prosecution not to make any reference to these confessional statements and to be sure no witnesses adverted to them.

However, as to all the inculpatory material resulting from the questioning in the Bradley County jail, he found:

"It is my feeling that because of the general atmosphere of *this* interrogation there was at all times an opportunity on behalf of the defendant, and a continuous opportunity to [re] examine the rights as [they] were explained to him.  \*  \*  \*  the defendant was not subjected to any physical or psychological, as *Miranda* sets forth, coercion or compulsion.  This was not a compelled statement.

"  \*  \*  \*  (T)here were no cuffs used on the defendant, he was  not shackled in any way.  He was in an interrogation room that was described as a room with a couch in it, a desk and some chairs; he was provided coffee; asked if he wanted Cokes and allowed to smoke cigarettes.

\*  \*  \*

"Twice he waived these rights directly by signature.  Sheriff Davis said he presented to the defendant a newspaper to determine whether or not the defendant could read.  And Sheriff Davis was convinced that the defendant could read.

\*  \*  \*

"The defendant at all times was aware, in my opinion, of his rights.  He was aware of these rights from the moment he was arrested to the moment he signed that statement.

\*  \*  \*

"The defendant gave a statement, after examining the entire atmosphere of this interrogation, that was completely voluntary, and freely made, with the knowledge at all times and an awareness — an acute awareness of his rights."  (Bracketed material and emphasis supplied.)

Unless it be the obligation of an appellate court on review to constitute itself an appellate advocate,

seeking out any possible technical defect in warning a defendant of his constitutional rights and explaining that he may also waive the presence of an attorney during questioning, the record in this case more than fairly establishes that defendant was explained his right to counsel and explicitly waived it.

Upon a careful review of the whole record we find no error.

The order denying the motion for a new trial is affirmed.

All concurred.