COURT OF APPEALS OF VIRGINIA

Present: Judges Alston, Chafin and Malveaux
Argued at Salem, Virginia

VINCENT EARL SPINNER

MEMORANDUM OPINION[*] BY
v.      Record No. 1070-16-3          JUDGE TERESA M. CHAFIN
                                      APRIL 3, 2018

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF CAMPBELL COUNTY
John T. Cook, Judge

Bernadette M. Donovan (Matthew L. Engle; Shameka L. Hall; Seth
Shelly; James Angel; Donovan & Engle, PLLC; Office of the Capital
Defender, on briefs), for appellant.

Matthew P. Dullaghan, Senior Assistant Attorney General
(Mark R. Herring, Attorney General, on brief), for appellee.


At the conclusion of a bench trial, the Circuit Court of Campbell County convicted

Vincent Earl Spinner of robbery and first-degree murder. On appeal, Spinner contends that the

circuit court erred by denying his motion to suppress the statements he made to police officers

following a modified Miranda warning. He also argues that the circuit court erred by admitting

documents derived from certain mental health disclosures required in capital murder cases in the

guilt phase of his trial.[1] For the reasons that follow, we affirm Spinner's convictions.

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Although Spinner presented additional assignments of error in his petition for appeal,
this Court denied his petition as to those assignments of error. Therefore, the issues presented in
Spinner's additional assignments of error are not before the Court.

## I. BACKGROUND

"In accordance with established principles of appellate review, we state the facts in the light most favorable to the Commonwealth, the prevailing party in the trial court[, and] accord the Commonwealth the benefit of all inferences fairly deducible from the evidence."  Riner v. Commonwealth, 268 Va. 296, 303, 601 S.E.2d 555, 558 (2004).  So viewed, the evidence is as follows.

Around 6:30 p.m. on August 3, 2012, eighty-nine-year-old James Payne was found murdered in his home.  Payne had been stabbed twenty-five times.  The amount of blood surrounding Payne's body indicated that he was killed several hours earlier.  Payne's wallet and two telephones belonging to Payne could not be located following his murder.

Spinner was Payne's son-in-law, and Payne provided significant financial assistance to him in the past.  Due to marital problems, Spinner returned to the Campbell County area from his home in Winchester on the morning of Payne's murder.  Spinner intended to live with his brother.  Spinner spent most of the morning of August 3, 2012, smoking crack cocaine with his friend, Patricia Bolen.  Around 1:00 p.m., however, Spinner left Bolen's apartment to go to an ATM.  Subsequent investigation revealed that Spinner did not have any money in his bank account.

Spinner's cell phone records showed that he called Payne at 12:54 p.m.  These records also showed that his phone traveled from Bolen's apartment to the vicinity of Payne's home between 1:00 p.m. and 2:00 p.m. on the day of the murder.  Shortly before 2:00 p.m., two of Payne's neighbors saw a gold car driven by a male matching Spinner's general description "speeding" out of Payne's driveway.  A video recording from a security camera at a nearby gas station confirmed that a gold car drove down the road in front of Payne's home at 1:56 p.m.

Although Payne's neighbors could not positively identify the driver of the car, they testified that Spinner's gold Honda Accord appeared to be the same car they saw leaving Payne's driveway.

At some point after 2:00 p.m., Spinner returned to Bolen's apartment and acquired more crack cocaine. Although Spinner had parked his car in front of Bolen's apartment earlier that day, he parked in an alley behind her house when he returned. Spinner was visibly nervous when he returned to the apartment. Bolen testified that Spinner appeared to be "scared" and that he was "shaking" as if "he had seen something." Another witness testified that Spinner was shaking so badly that he spilled cocaine on himself and that he had changed clothes since earlier that day.

Police officers notified Spinner of Payne's death the following day. Spinner appeared to be shocked by the news. Spinner told the officers that he had been at Bolen's apartment and the nearby neighborhood all day, and he consented to a search of his car. During the search, a police officer found Payne's 2006 Humana insurance card under the driver's seat of the car. When police officers informed Spinner about the discovery of the card, Spinner could not explain why it was in his car. Payne's family members and his caregiver later testified that they did not believe that Payne had ever been in Spinner's car.

On the evening of August 5, 2012, police officers executed two search warrants at Spinner's brother's home. The officers searched the house, and seized items of Spinner's clothing, his wallet, and his cell phone. The officers also collected DNA samples from Spinner, and took clippings from his fingernails.

Investigator Mike Milnor spoke to Spinner while another officer obtained the nail clippings from him. At the initiation of their conversation, Milnor informed Spinner of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). Specifically, Milnor told Spinner:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to

a lawyer and have him present with you while you're being questioned.  If you cannot afford to hire a lawyer, one will be appointed to represent you before any question and if you wish one . . . [i]f you're charged with a crime.  You can decide at any time to exercise any of these rights and stop answering questions at any time or to stop . . . making any statements.[2]

Although Milnor read Spinner his rights from a pre-printed card, he added the caveat "if you're charged with a crime" to the fourth sentence of the <u>Miranda</u> warning in anticipation of questions from Spinner.

After he was advised of his rights, Spinner admitted that he left Bolen's apartment on the day of Payne's murder to sell a television.  Spinner also admitted that he did not go to an ATM and that he had planned to visit Payne that day.  Spinner then told Milnor that he knew "the house of cards was falling" and for Milnor to "let them fall."  He also said, "[I]f I have to die for this, then I do."

Milnor and another officer arrested Spinner on August 7, 2012.  The other officer advised Spinner of his <u>Miranda</u> rights without adding the caveat used by Milnor before the previous interrogation.  Milnor then spoke to Spinner as he was being transported to jail.  Milnor explained the evidence the police had collected against Spinner, and asked Spinner if he did not intend to kill Payne.  Spinner nodded his head up and down in response to Milnor's question without vocalizing a response.  When Spinner arrived at the jail, he asked for an attorney and the officers stopped speaking with him.

Prior to his trial, Spinner moved to suppress the statements he made to the police on numerous constitutional grounds.  As his primary argument, Spinner argued that Milnor's first <u>Miranda</u> warning did not effectively inform him of his rights.  Specifically, Spinner argued that the additional caveat informing him that he would only be appointed an attorney if he was

---

[2] The <u>Miranda</u> warning has been altered to omit a comment from Milnor that did not relate to the substance of the warning and a comment from counsel.

"charged with a crime" implied that he did not have the right to an appointed attorney during the interrogation. Although the caveat that Milnor inserted into the initial warning was not used in the second Miranda warning given after Spinner was arrested, Spinner argued that the statements he made to the police following the second warning were impermissibly tainted by the ineffective first warning. The circuit court denied Spinner's motion on two grounds, concluding that: 1) Spinner was not in custody when Milnor initially advised him of his rights, and 2) that the additional caveat did not invalidate Milnor's first Miranda warning.

Although Spinner was initially indicted for capital murder and robbery, his capital murder indictment was eventually amended to charge him with first-degree murder. In the guilt phase of Spinner's trial, the Commonwealth attempted to introduce records documenting how much money Spinner had in his possession when he was booked into jail and the current status of his jail spending account. Spinner objected to the admission of these documents. Spinner argued that the Commonwealth derived the evidence at issue from the mental health disclosures that he made when he was charged with capital murder. Citing Code §§ 19.2-264.3:1 and 19.2-264.3:3, Spinner maintained that any evidence the Commonwealth derived from his mental health disclosures was only admissible in rebuttal to any mitigation defense he presented at sentencing.[3] Spinner further argued that the use of the evidence at issue during the guilt phase of his trial would violate his constitutional rights.

---

[3] Code § 19.2-264.3:3 states, in pertinent part:

> No statement or disclosure by the defendant made during . . . a
> mental condition evaluation performed pursuant to [Code]
> § 19.2-264.3:1 . . . , and no evidence derived from any such
> statements or disclosures may be introduced against the defendant
> at the sentencing phase of a capital murder trial for the purpose of
> proving the aggravating circumstances specified in [Code]
> § 19.2-264.4. Such statements or disclosures shall be admissible in
> rebuttal only when relevant to issues in mitigation raised by the
> defense.

The Commonwealth acknowledged that the records at issue were included in Spinner's mental health disclosures. Moreover, the Commonwealth candidly admitted that it only became aware of the records by reviewing Spinner's disclosures. The Commonwealth argued, however, that it did not derive the records at issue from Spinner's mental health disclosures because it obtained them directly from the jail, an independent source. The Commonwealth also noted that the jail records were not privileged in any way. The circuit court agreed that Code §§ 19.2-264.3:1 and 19.2-264.3:3 did not apply under the circumstances of this case, overruled Spinner's objection, and admitted the documents at issue into evidence.

At the conclusion of Spinner's trial, the circuit court convicted him of the charged offenses. The circuit court later sentenced Spinner to two life terms of imprisonment. This appeal followed.

## II. ANALYSIS

On appeal, Spinner contends that the circuit court should have suppressed the statements that he made to the police on the evening when they executed the search warrants at his brother's home and the statements that he made to them while he was being transported to jail following his arrest. Spinner maintains that he was in custody during these interactions and that the <u>Miranda</u> warnings he received at the beginning of each interaction did not effectively inform him of his constitutional rights. Spinner also contends that the circuit court erred by admitting the jail records derived from his mental health disclosures in the guilt phase of his trial.

Upon review, we conclude that both of the <u>Miranda</u> warnings given to Spinner effectively informed him of his constitutional rights. Therefore, the circuit court did not err by denying his motion to suppress the statements he made to the police. Furthermore, we conclude that any error resulting from the consideration of the jail records at issue was harmless beyond a reasonable doubt.

- 6 -

A.  MILNOR EFFECTIVELY ADVISED SPINNER OF HIS <u>MIRANDA</u> RIGHTS

In reviewing the denial of a motion to suppress, "we determine whether the accused has met his [or her] burden to show that the trial court's ruling, when the evidence is viewed in the light most favorable to the Commonwealth, was reversible error."  <u>Roberts v. Commonwealth</u>, 55 Va. App. 146, 150, 684 S.E.2d 824, 826 (2009).  This Court is "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers."  <u>McGee v. Commonwealth</u>, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*).  However, "[w]e review *de novo* the trial court's application of the law to the particular facts of the case."  <u>Branham v. Commonwealth</u>, 283 Va. 273, 279, 720 S.E.2d 74, 77 (2012).

Assuming without deciding that Spinner was in custody when the police executed the search warrants at his brother's house, we conclude that Milnor's initial <u>Miranda</u> warning effectively advised Spinner of his constitutional rights.  Although the warning given by Milnor included the caveat that an attorney would be appointed for Spinner if he was "charged with a crime," it was a "fully effective equivalent" of the warning mandated by <u>Miranda</u>.

In <u>Miranda</u>, the Supreme Court of the United States "established certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation."  <u>Duckworth v. Eagan</u>, 492 U.S. 195, 201 (1989).  In order to provide "concrete constitutional guidelines for law enforcement agencies and courts to follow," <u>Miranda</u> required police officers to advise suspects of four now-familiar warnings.  <u>Florida v. Powell</u>, 559 U.S. 50, 59 (2010) (quoting <u>Miranda</u>, 384 U.S. at 441-42).  Specifically, <u>Miranda</u> prescribed that:

> [A suspect] must be warned prior to any questioning [1] that he has
> the right to remain silent, [2] that anything he says can be used

against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Id. at 59-60 (alterations in original) (quoting Miranda, 384 U.S. at 479).

While the warnings Miranda requires are "invariable," the Supreme Court has not "dictated the words in which the essential information must be conveyed." Id. at 60. The Supreme Court "has never indicated that the 'rigidity' of Miranda extends to the precise formulation of the warnings given a criminal defendant." California v. Prysock, 453 U.S. 355, 359 (1981). In fact,

> Miranda itself indicated that no talismanic incantation was required to satisfy its strictures. The Court in that case stated that "[the] warnings required and the waiver necessary in accordance with our opinion today are, *in the absence of a fully effective equivalent*, prerequisites to the admissibility of any statement made by a defendant."

Id. at 359-60 (quoting Miranda, 384 U.S. at 476). "Reviewing courts therefore need not examine Miranda warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'convey to [a suspect] his rights as required by Miranda.'" Duckworth, 492 U.S. at 203 (quoting Prysock, 453 U.S. at 361).

The Supreme Court addressed a similar factual situation in Duckworth. In that case, a police officer advised a suspect that he had the right to remain silent and that anything he said could be used against him in court. Id. at 198. The officer then told the suspect that he had the right to speak to an attorney before he answered any questions and to have an attorney present during questioning. Id. While the officer advised the suspect that he had the right to an appointed attorney if he could not afford one, the officer told the suspect that an attorney would be appointed for him "if and when" he went to court. Id. The officer then told the suspect that

he had the right to stop answering questions at any time and that he could refuse to answer questions until he had talked to an attorney.  Id.

The suspect argued that the officer's warning did not comply with Miranda because it linked his right to appointed counsel to the occurrence of a future event, his appearance in court. See id. at 199.  The Supreme Court disagreed with the suspect's argument and concluded that the officer's warning "touched all of the bases required by Miranda."  Id. at 203.  The Supreme Court acknowledged that the officer told the suspect that he would be appointed an attorney "if and when" he went to court, but also noted that the officer advised the suspect that he had the right to speak to an attorney before and during questioning.  Id.  The Supreme Court explained that the officer's "if and when you go to court" caveat accurately described the procedure for the appointment of counsel in the suspect's jurisdiction and "simply anticipated" a "relatively commonplace" question the suspect could be expected to ask regarding when he would obtain counsel.  Id. at 204.  Reading the "if and when" language with the other warnings given to the suspect, the Supreme Court determined that the warnings, "in their totality," satisfied Miranda. Id. at 205.

Milnor's warning in the present case is similar to the warning upheld in Duckworth.  Like the officer in Duckworth, Milnor anticipated that Spinner would ask questions regarding when he would be appointed an attorney.  Accordingly, he added a caveat to his standard Miranda warning to explain that Spinner would be appointed an attorney if he was "charged with a crime."  This advice simply described the procedure for the appointment of counsel to indigent persons in Virginia.  See Code §§ 19.2-157 to 19.2-160; see also Poyner v. Commonwealth, 229 Va. 401, 409, 329 S.E.2d 815, 822 (1985) ("Miranda nowhere requires that a suspect be told he has the right to the immediate appointment of counsel.").

Like the officer in Duckworth, Milnor advised Spinner that he had the right to remain silent and that anything he said could be used against him in court. He then told Spinner, "If you cannot afford to hire a lawyer, *one will be appointed to represent you before any question . . .* [i]f you're charged with a crime." Milnor explained that Spinner had the right to have an attorney present during questioning and that he could exercise his rights and stop answering questions at any time. After considering the totality of Milnor's warning to Spinner, we conclude that it was the "fully effective equivalent" of the warning required by Miranda.[4] See Duckworth, 492 U.S. at 205.

While Spinner also contends that the statements he made to police officers as he was being transported to jail should have been suppressed, his argument is entirely contingent on the effectiveness of Milnor's initial Miranda warning. Spinner maintains that the second Miranda warning given to him shortly after he was arrested was ineffective because it was tainted by Milnor's earlier ineffective warning. As Milnor's initial warning effectively advised Spinner of his constitutional rights, it did not impermissibly taint the second Miranda warning. Accordingly, Spinner's argument pertaining to the statements he made following his second Miranda warning is without merit.

As Spinner was effectively advised of his Miranda rights before he made the statements at issue, the circuit court did not err by denying his motion to suppress.

### B. THE ADMISSION OF SPINNER'S JAIL RECORDS WAS AT MOST HARMLESS ERROR

Spinner also contends that the circuit court erred by admitting the jail records derived from his mental health disclosures during the guilt phase of his trial. Assuming without deciding

---

[4] We note that this Court upheld a Miranda warning containing an almost identical caveat in Boothe v. Commonwealth, No. 1703-96-3, 1997 Va. App. LEXIS 328 (Va. Ct. App. May 27, 1997). While this unpublished opinion has no precedential value, we cite it here as an informative decision pursuant to Rule 5A:1(f).

that the circuit court erred by admitting the records at issue, any error resulting from the admission of these documents was harmless.[5]

While the admission of the evidence at issue is governed in part by statute, see Code §§ 19.2-264.3:1 and 19.2-264.3:3, the use of evidence derived from Spinner's mental health disclosures during the guilt phase of his trial also implicates his constitutional rights. See generally Kansas v. Cheaver, 134 S. Ct. 596, 603 (2013); Buchanan v. Kentucky, 483 U.S. 402, 423-25 (1987); Estelle v. Smith, 451 U.S. 454, 474 (1981). Therefore, we apply the standard of review used to determine whether a constitutional error is harmless to assess the magnitude of the error alleged in this case.[6]

> [W]hen a federal constitutional error is involved, a reversal is required unless the reviewing court determines that the error is harmless beyond a reasonable doubt. The reviewing court must determine whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. In making that determination, the court must consider, among other factors, the importance of the tainted evidence in the prosecution's case, whether that evidence was cumulative, the presence or absence of evidence corroborating or contradicting the tainted evidence on material points, and the overall strength of the prosecution's case.

Zektaw v. Commonwealth, 278 Va. 127, 139-40, 677 S.E.2d 49, 56 (2009) (internal citations and quotations omitted) (quoting Pitt v. Commonwealth, 260 Va. 692, 695, 539 S.E.2d 77, 78 (2000)).

Spinner contends that the admission of the jail records at issue was not harmless because the records established his motive for killing Payne, i.e., his poverty and resulting need for

---

[5] We express no opinion concerning the substance of Spinner's argument regarding the admissibility of the records at issue.

[6] Although we review this issue under the standard pertaining to constitutional error, we note that the alleged error would also be harmless under the less stringent standard of review pertaining to non-constitutional error. See Code § 8.01-678; Clay v. Commonwealth, 262 Va. 253, 260, 546 S.E.2d 728, 731-32 (2001).

money.  The records at issue, however, were cumulative of other competent evidence establishing Spinner's financial circumstances.  Thus, the records in and of themselves were not critical to the Commonwealth's case against Spinner.

Additional evidence presented by the Commonwealth implied that Spinner did not have much money when Payne was killed.  Several witnesses testified that both Spinner and his wife needed significant financial assistance from Payne and his family throughout their marriage.  Payne's daughter-in-law testified that Spinner asked her for money in June 2012 and that he implied that he needed more money when he called her one week before Payne's death.  Spinner's bank records, which were admitted without objection, showed that his account was overdrawn by over four hundred dollars on July 16, 2012.[7]  Moreover, Spinner's wallet only contained five dollars and some loose change when it was seized by police officers two days after Payne's murder.  When viewed with this evidence, the records establishing how much money Spinner had when he went to jail were inconsequential.

Furthermore, the Commonwealth presented substantial circumstantial evidence establishing Spinner's guilt.  See Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983) ("Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.").

The Commonwealth's evidence placed Spinner at Payne's home on the day of the murder.  Spinner's cell phone records showed that he called Payne on August 3, 2012, and that his phone traveled from Bolen's apartment to the vicinity of Payne's home between 1:00 p.m. and 2:00 p.m. on that day.  Two witnesses saw a car driven by an individual matching Spinner's general description "speeding" down Payne's driveway around 2:00 p.m., and they testified that

---

[7] This account was closed sometime before August 14, 2012.

the car looked like Spinner's gold Honda Accord. When police officers searched Spinner's car, they found Payne's Humana insurance card under the driver's seat even though Payne had never been in the vehicle.

Two witnesses testified about Spinner's conduct on the day of the murder. Bolen testified that Spinner left her apartment around 1:00 p.m. after they had smoked crack cocaine for most of the day. Spinner told Bolen that he was going to visit an ATM, even though he did not have any money in his bank account. Although Spinner could not have withdrawn money from a bank or an ATM, he acquired a substantial amount of crack cocaine shortly after he returned to Bolen's apartment sometime after 2:00 p.m. Bolen and the other witness testified that Spinner was "shaking" and nervous when he returned to the apartment, and the other witness testified that Spinner had changed his clothes since earlier that day. Bolen also explained that Spinner parked his car in an alley behind her apartment rather than on the street after he returned.

More importantly, Spinner made statements to the police officers investigating Payne's murder that implicitly acknowledged his responsibility for the crime. After being confronted with evidence linking him to the murder, Spinner told Milnor that he knew "the house of cards was falling" and for Milnor to "let them fall." He also said, "[I]f I have to die for this, then I do." After his arrest, Spinner nodded his head in agreement when Milnor suggested that he did not intend to kill Payne.

In light of the cumulative nature of the jail records at issue, their relative lack of importance, and the overall strength of the Commonwealth's case, we conclude that any error potentially resulting from the admission of the records was harmless beyond a reasonable doubt. The records at issue could not have reasonably contributed to Spinner's convictions.

III. CONCLUSION

In summary, we hold that the circuit court did not err by denying Spinner's motion to suppress the statements that he made to the police. Spinner received a "fully effective equivalent" of the warning required by <u>Miranda</u> before he made the statements at issue. We also hold that any error resulting from the admission of the jail records derived from Spinner's mental health disclosures was harmless beyond a reasonable doubt. Accordingly, we affirm Spinner's convictions.

<u>Affirmed.</u>