Filed 1/13/22  P. v. Yasaroglu CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073738 |
| v. | (Super.Ct.No. INF1701457) |
| SINAN YASAROGLU, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Frederick Paul Dickerson III, Judge.  Affirmed in part, vacated in part, and modified with directions.

Paul R. Kraus, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Andrew Mestman and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Sinan Yasaroglu of one felony count of driving or taking a vehicle worth more than $950 without permission of the owner (Veh. Code, §10851, subd. (a) (Veh. Code, § 10851(a)), one felony count of unlawfully receiving the same stolen vehicle (Pen. Code, § 496d, subd. (a) (Pen. Code, § 496d(a)), and one misdemeanor count of driving a vehicle without a valid driver's license (Veh. Code, § 12500, subd. (a)). The trial court placed Yasaroglu on three years of probation.

On appeal, Yasaroglu argues that (1) the trial court prejudicially erred by admitting his postarrest statements to a law enforcement officer, which he claims were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), (2) we should reverse his conviction under Penal Code section 496d because he cannot be convicted of both stealing and receiving the same vehicle, (3) the trial court prejudicially erred by failing to instruct the jury on the prohibition against such dual convictions, and (4) the trial court erred by failing to consider his ability to pay restitution and various fines and fees. We conclude that under newly enacted statutes, which became effective while this appeal was pending, Yasaroglu's probation term must be reduced to two years, and several court-imposed costs must be stricken. We otherwise affirm the judgment.

BACKGROUND

A. *Law Enforcement Officers*

In August 2017, Victor H. was 75 years old and lived in an assisted living facility in a gated community.[1] Victor owned a 2016 Hyundai Azera, which he had purchased

---

[1] All unspecified complete dates refer to the year 2017.

2

for around $40,000 or more.  Victor previously had been in a romantic relationship with Yasaroglu for years, and the two had lived together.

On August 9, Victor reported his car stolen.  He had discovered it missing two or three days earlier.  Victor had parked the car in a secured parking garage at the assisted living facility.

Victor spoke to a sheriff's deputy and reported that he suspected his ex-boyfriend, Yasaroglu, had taken his car.  Victor told the deputy that Yasaroglu did not have permission to take or to use the vehicle.  Victor explained that Yasaroglu might have had a key to the car.  While the men lived together, Victor had a spare key made for Yasaroglu, which Yasaroglu did not return.

Before he reported the car stolen, Victor called Yasaroglu.  Yasaroglu answered the phone and admitted to Victor that he was driving the car.  Yasaroglu hung up on Victor because he did not want to get ticketed for using a cell phone while driving.

Victor provided the deputy with a copy of Yasaroglu's California identification card, Yasaroglu's certificate of naturalization, and a certified letter Victor mailed to Yasaroglu two months earlier.  The deputy attached the documents to his report, and they were admitted into evidence.  The letter stated:  "I had advised you at no time, were you to take my car.  I had to hide the key and my wallet every night, to prevent this from happening.  You know you did not have my permission to take it.  You have now had my car for 10 days."

On August 11, California Highway Patrol (CHP) officer James Moran noticed a disabled silver Hyundai Azera on the shoulder of the I-10 freeway, so he pulled in behind the vehicle. He found Yasaroglu asleep in the back seat and woke him. Yasaroglu explained that he had pulled over to take a nap. Officer Moran directed Yasaroglu to exit the freeway because it was not a safe place to park. Yasaroglu exited the car. Officer Moran noticed Yasaroglu remove a key fob from his pocket, so Officer Moran assumed that Yasaroglu owned the car. Officer Moran then received an urgent call and left the scene before Yasaroglu complied with the directive to exit the freeway.

About two hours later, Officer Moran passed by the same location and found Yasaroglu still parked there. Officer Moran stopped to investigate again. Yasaroglu explained that the car battery was dead, the car had no gas, and his cell phone battery died. Officer Moran offered to drive Yasaroglu to a gas station, and Yasaroglu accepted. Officer Moran then ran the license plate of the car. After driving away from the scene with Yasaroglu seated in the front passenger seat of the patrol car, Officer Moran was informed by dispatch that the owner had reported the car stolen. Officer Moran exited the freeway, pulled over, and told Yasaroglu that he had to check the patrol car's front right tire. Officer Moran walked around the vehicle, opened the passenger door, and directed Yasaroglu to exit the vehicle, which Yasaroglu did. Officer Moran then informed Yasaroglu that the car had been reported stolen, and he arrested Yasaroglu. Officer Moran learned from dispatch that Yasaroglu's driver's license was suspended.

4

Yasaroglu continued to speak to Officer Moran for about 30 or 40 minutes after being taken into custody. He explained that his partner, Victor, owned the car. Yasaroglu claimed that he drove the car regularly and had taken it with Victor's permission. Yasaroglu said that when he and Victor argued, Victor often threatened to call law enforcement and report the car stolen. It angered Yasaroglu that Victor had followed through with the threat.

Yasaroglu explained that before August 11 Victor called Yasaroglu and asked him to return the car. According to Officer Moran, Yasaroglu said that he hung up on Victor, and "he basically chose not to return the vehicle because he was still in possession of it two days later." Yasaroglu told Officer Moran "that he had refused to bring the car back as requested." Yasaroglu "acknowledge[d] that he did not have permission to have the car at that time." When Officer Moran found Yasaroglu, Yasaroglu was not taking the car back to Victor.

Later that day, Officer Moran spoke with Victor. Victor said that he wanted Yasaroglu prosecuted for stealing his car. Officer Moran asked Victor how Yasaroglu had obtained a car key. Victor thought that he had both of the car's keys but then remembered that months earlier Yasaroglu claimed to have lost a key, which prompted Victor to order new keys. Victor told Officer Moran about the June 2017 letter he sent to Yasaroglu, instructing him not to drive the car. Victor also told Officer Moran about the recent phone call in which he had asked Yasaroglu to return his car, but Yasaroglu hung

up on him.  Victor also reported that Yasaroglu had "scammed" Victor out of $800,000, which Victor believed Yasaroglu used to pay gambling debts.

B. *The Victim's Testimony*

Victor testified for the prosecution.  Victor claimed that when he called law enforcement to report the car stolen, it was a "misunderstanding," and he actually had given Yasaroglu permission to borrow the car.  But Victor also explained that the supposed "misunderstanding" was that he was not interested in pressing charges against Yasaroglu.  Victor admitted that he had "some anger problems," particularly with Yasaroglu.

Victor claimed not to remember calling Yasaroglu the day before he called law enforcement, and he also could not remember telling the deputy about the call.  He also did not remember what he told law enforcement about Yasaroglu stealing the car.  Victor explained that his memory may have been affected by some medication he was taking.

Victor testified that he told law enforcement officers that he had loaned Yasaroglu $850,000 for a business.  Sometime after Yasaroglu was arrested, Yasaroglu promised to repay Victor once the criminal cases were resolved.  According to Victor, he and Yasaroglu needed to travel to Turkey together in order for Yasaroglu to repay him.  Victor needed the money to pay for his residence at the assisted living facility.

Victor admitted that in January 2017 he filed a request for an order to protect him from Yasaroglu.  A temporary restraining order was granted.  The request and the order were admitted into evidence.  Victor asked for the restraining order partly because

Yasaroglu had previously stolen Victor's car. Victor admitted that Yasaroglu hit Victor on his hand, causing bruising. Victor attached photos of the bruises to his request.

Victor also acknowledged that in May 2017 a criminal protective order was issued to protect him from Yasaroglu. That order too was admitted into evidence. Victor also acknowledged that in June 2017 he had emailed Yasaroglu to tell him that he did not have permission to take Victor's car. But Victor claimed not to remember having any disagreements with Yasaroglu in 2017.

Victor ended his testimony by saying that it was reasonable to conclude that Yasaroglu had permission to possess Victor's car from August 6 through August 11.

Officer Moran and the sheriff's deputy who initially took the stolen vehicle report both testified that Victor never equivocated about Yasaroglu not having permission to possess the vehicle. He never told them about any misunderstanding. Victor never said that he had problems with his memory.

## DISCUSSION

### A. Miranda *Advisements*

Yasaroglu argues that the trial court prejudicially erred by admitting his postarrest statements to Officer Moran because Officer Moran failed to advise Yasaroglu of his right to a court-appointed attorney, in violation of *Miranda*. We are not persuaded.

#### 1. *Relevant Proceedings*

Before trial, defense counsel orally moved to exclude Yasaroglu's postarrest statements. Officer Moran testified at a hearing on the matter.

7

After Officer Moran handcuffed Yasaroglu, Yasaroglu started asking Officer Moran "lots of questions," so Officer Moran told him to "hold on" to allow Officer Moran to finish taking him into custody and so he could advise Yasaroglu of his rights. Officer Moran advised Yasaroglu of his *Miranda* rights verbally from memory. On direct examination, Officer Moran testified that "[t]o the best of [his] ability" he "remember[ed]" advising Yasaroglu that "he had the right to remain silent," "anything that he would say from this point forward would be used against him in a court of law," "he had the right to have [an] attorney present before and during questioning," and "if he can't afford an attorney, one would be appointed for him free of charge." Officer Moran believed that Yasaroglu understood the advisements that Officer Moran gave to him. Yasaroglu did not ask for an attorney and continued talking to Officer Moran.

On cross-examination, Officer Moran acknowledged that he had not reviewed the recording of Yasaroglu's arrest. Defense counsel asked if Officer Moran's advisement to Yasaroglu had been: "[Y]ou do have the right to remain silent, and anything you say can and could be [used] against you in a court of law; you do have a right to have an attorney present before answering any questions for me[.]" Officer Moran answered: "Yes. I believe that was the—the—if—if that's what the report says. I don't recall exactly what was said on the recording, but to that—it was something like that, yes." Defense counsel asked Officer Moran if he had failed to advise Yasaroglu that he had a right to a court-appointed attorney. Officer Moran answered: "I may not have I said that, if it's not on the MVARs." Defense counsel did not introduce the recording.

8

The trial court denied the defense motion, concluding that Officer Moran had substantially complied with *Miranda* and that Yasaroglu waived his rights, which he understood, by continuing to speak with Officer Moran.  The trial court explained:  "The officer concedes he may not have said, 'If you can't afford an attorney, one would be appointed'—'appointed for you.'  The Court find[s] that is not a requirement to be substantially in compliance with *Miranda*."

2.  *Analysis*

In *Miranda*, *supra*, 384 U.S. 436, the United States Supreme Court set forth specific procedural safeguards that require law enforcement to advise suspects of their Fifth and Fourteenth Amendment rights before any custodial interrogation.  (*Duckworth v. Eagan* (1989) 492 U.S. 195, 201-202 (*Duckworth*).)  The suspect must be advised that (1) "he has the right to remain silent," (2) "anything he says can be used against him in a court of law," (3) "he has the right to the presence of an attorney," and (4) "if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  (*Miranda*, at p. 479; *People v. Weaver* (2001) 26 Cal.4th 876, 918 (*Weaver*).)  The *Miranda* warnings do not need to be "given in the exact form described in that decision."  (*Duckworth*, *supra*, at p. 202.)  We instead focus on whether the warnings reasonably conveyed to the suspect his or her rights as required by *Miranda*.  (*Duckworth*, at p. 202 .)  "We apply federal standards in reviewing defendant's claim that the challenged statements were elicited from him in violation of *Miranda*."  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033.)  "Statements made by a custodial defendant in

the absence of *Miranda* warnings are inadmissible in the prosecution's case-in-chief." (*Weaver*, *supra*, at p. 918.)

When a criminal defendant challenges the voluntariness of his confession at trial, "the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary." (*Lego v. Twomey* (1972) 404 U.S. 477, 489; *People v. Markham* (1989) 49 Cal.3d 63, 70-72.) When we review a trial court's ruling on whether "a statement was collected in violation of the defendant's rights under *Miranda*, *supra*, 384 U.S. 436, we defer to the trial court's resolution of disputed facts, including the credibility of witnesses, if that resolution is supported by substantial evidence." (*Weaver*, *supra*, 26 Cal.4th at p. 918.) "Considering those facts, as found, together with the undisputed facts, we independently determine whether the challenged statement was obtained in violation of *Miranda*'s rules [citation], that is, whether (assuming the defendant was in custody) the statement was preceded by the now-famous admonition of *Miranda* rights . . . ." (*Ibid.*)

Yasaroglu's only argument on appeal challenging the adequacy of the *Miranda* advisement is that he "was not told that he would be provided an attorney if he could not afford one. [Citation.] Officer Moran's *Miranda* warnings were inadequate." The argument is not supported by the record. The trial court did not find that Officer Moran failed to advise Yasaroglu that he would be provided with an attorney if he could not afford one. Rather, the court noted that Officer Moran conceded that "he may not have" advised Yasaroglu of the right to a court-appointed attorney, but the court further found

that such an advisement was not necessary for substantial compliance with *Miranda*.[2]

Officer Moran did concede that he might not have advised Yasaroglu of that right "if it's not on the [recording,]" but no party introduced the recording. Officer Moran otherwise testified that "[t]o the best of [his] ability" he "remember[ed]" advising Yasaroglu that if he could not "afford an attorney, one would be appointed for him free of charge," in addition to the other three *Miranda* rights.

Because the record does not support Yasaroglu's contention that he "was not told that he would be provided an attorney if he could not afford one," we must reject his argument that the trial court erred by denying his motion to exclude his postarrest statements to Officer Moran.

B. *CALCRIM No. 3516, and the Dual Conviction Prohibition*

Yasaroglu argues that the trial court prejudicially erred by failing to instruct the jury with CALCRIM No. 3516 on the prohibition against dual convictions for taking and receiving the same stolen property. He also argues that his convictions under both Vehicle Code section 10851(a) and Penal Code section 496d(a) violate the rule against dual convictions, so we should reverse the conviction for receipt of the stolen vehicle. The People concede the instructional error but argue that it was harmless given the strong

---

[2]     The trial court's determination that even if Officer Moran failed to advise Yasaroglu of his right to a court-appointed attorney the advisement would have substantially complied with *Miranda* is legally erroneous. Such an advisement would not convey any information to a criminal suspect about one of the four prescribed *Miranda* rights (*Duckworth*, *supra*, 492 U.S. at p. 202) and thus would violate *Miranda* (*People v. Bradford* (2008) 169 Cal.App.4th 843, 854).

11

evidence supporting a nontheft offense conviction under Vehicle Code section 10851(a).

The People also argue that, given the strength of the evidence supporting the nontheft

offense conviction, Yasaroglu was not improperly convicted of both taking and receiving

the same stolen property. We agree with the People on all points.**3**

A criminal defendant may not be convicted of both stealing and receiving the

same property. (*People v. Ceja* (2010) 49 Cal.4th 1, 4-5.) This common law rule against

dual convictions is "founded on the notion that it is 'logically impossible for a thief who

has stolen an item of property to buy or receive that property from himself.'" (*Ibid.*) If a

defendant is wrongly convicted of both taking and receiving the same property, then the

receiving conviction should be reversed. (*Id.* at pp. 9-10.)

Vehicle Code section 10851(a) describes two distinct offenses—the unlawful

taking of a vehicle with the intent to permanently deprive the owner of possession, which

is a theft offense, and the unlawful driving of a vehicle with the intent to permanently

deprive the owner of possession. (*People v. Garza* (2005) 35 Cal.4th 866, 876 (*Garza*);

*People v. Calistro* (2017) 12 Cal.App.5th 387, 394.) When the unlawful "driving occurs

or continues after the theft is complete" (in other words, "'posttheft driving'"), the

---

**3** Defense counsel did not move to dismiss either of Yasaroglu's felony convictions for violating the prohibition against dual convictions. Yasaroglu argues that we should review the claim of error in any event because counsel was allegedly deficient for failing to do so. But he cites no authority for the proposition that such a motion was necessary. The People do not argue that Yasaroglu forfeited the argument. Because we conclude that Yasaroglu was not improperly convicted of taking and receiving the same stolen property, we need not decide whether Yasaroglu forfeited the argument or whether counsel's performance was in any way deficient. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 649, fn. 7 ["We need not decide whether defendant's appellate claim fails on this procedural ground, however, because the claim fails on its merits"].)

12

offense is not a theft offense. (*Garza*, *supra*, at p. 871; *People v. Page* (2017) 3 Cal.5th 1175, 1183 (*Page*).) When "the evidence shows a 'substantial break' between the taking and the driving, posttheft driving may give rise to a conviction under Vehicle Code section 10851 distinct from any liability for vehicle theft." (*Page*, *supra*, at p. 1188; *People v. Strong* (1994) 30 Cal.App.4th 366, 375 (*Strong*).) Thus, "a defendant who steals a vehicle and then continues to drive it after the theft is complete commits separate and distinct violations of [Vehicle Code] section 10851(a)." (*Garza*, at p. 880.)

A person who violates Vehicle Code section 10851(a) "by taking a car with the intent to permanently deprive the owner of possession, and who is convicted of that offense on that basis, cannot also be convicted of receiving the same vehicle as stolen property." (*Garza*, *supra*, 35 Cal.4th at p. 876.) If a conviction under Vehicle Code section 10851(a) is based on posttheft driving, however, then a separate conviction "for receiving the same vehicle as stolen property is not precluded." (*Garza*, at p. 876.)

The trial court has a sua sponte obligation to instruct the jury that it cannot convict a defendant "both for theft and for receiving the same stolen property." (*Garza*, *supra*, 35 Cal.4th at p. 881.)

Yasaroglu was charged with one count of violating Vehicle Code section 10851(a), based on both forms of the offense (theft and posttheft driving). The amended information alleged that "on or about" August 11 Yasaroglu did "willfully and unlawfully *drive or take*" Victor's vehicle "without the consent of and with intent to deprive the owner of title to and possession of said vehicle." (Italics added.) The jury accordingly

13

was instructed that it could find Yasaroglu guilty of violating section 10851 of the Vehicle Code if the prosecution proved that Yasaroglu either "took or drove someone else's vehicle without the owner's consent." The trial court did not, however, instruct the jury that it had to choose between those theories or that dual convictions for stealing and receiving are prohibited. With respect to the instruction on the prohibition against dual convictions (CALCRIM No. 3516), the trial court declined without explanation to give the instruction. The jury found Yasaroglu guilty as charged. The verdict did not specify whether the jury found Yasaroglu guilty on the basis of taking or posttheft driving.

This case is materially indistinguishable from *Garza*, *supra*, 35 Cal.4th 866. In *Garza*, the Supreme Court addressed whether dual convictions under Vehicle Code section 10851(a) and for receiving the same stolen vehicle under Penal Code section 496, subdivision (a), are prohibited.[4] (*Garza*, at p. 871.) There, "the evidence at trial adequately supported the [Vehicle Code] section 10851(a) conviction on either a taking or a posttheft driving theory, the prosecutor argued both the taking and the posttheft driving theories to the jury, the trial court's instructions did not require the jury to choose between the theories and did not explain the rule prohibiting convictions for stealing and receiving the same stolen property, and the jury's guilty verdict did not disclose which theory or theories the jurors accepted." (*Garza*, at p. 871.) *Garza* concluded that when

---

**4**     The Legislature codified the common law rule against dual convictions in Penal Code section 496, subdivision (a). (*Garza*, *supra*, 35 Cal.4th at p. 874.) Penal Code section 496d(a) does not include similar language codifying the common law rule. But the common law rule still applies, and *Garza* is not materially distinguishable on this ground.

"the evidence is such that it is not reasonably probable that a properly instructed jury would have found that the defendant took the vehicle but did not engage in any posttheft driving, a reviewing court may construe the Vehicle Code section 10851(a) conviction as a conviction for posttheft driving and on this basis may uphold the conviction . . . [citation] for receiving the same vehicle as stolen property." (*Id*. at p. 872.)

Under *Garza*, we presume that Yasaroglu's dual convictions—for unlawful taking or driving under Vehicle Code section 10851(a) and for receiving stolen property under Penal Code 496d(a)—are valid. (*Garza*, *supra*, 35 Cal.4th at p. 881.) We then "will set aside either or both of the convictions only if defendant has affirmatively shown prejudicial error amounting to a miscarriage of justice." (*Ibid.*)

Like the defendant in *Garza*, Yasaroglu has demonstrated error. (*Garza*, *supra*, 35 Cal.4th at p. 881.) The trial court erred by not instructing the jury with CALCRIM No. 3516 on the prohibition against dual convictions. (*Garza*, at p. 881.) Yasaroglu argues that the error is subject to the federal harmlessness standard of *Chapman v. California* (1967) 386 U.S. 18, 24 because the failure to instruct the jury about the dual conviction rule purportedly violated his constitutional right "to present a defense." We cannot agree, because in *Garza* the Supreme Court applied the state law harmlessness standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 to analyze whether an identical error prejudiced the defendant. (*Garza*, at pp. 881-882.) We are bound by Supreme Court precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Moreover, regardless of whether the instruction was given, defense counsel could have

15

argued that the jury could not convict Yasaroglu under the theft theory of Vehicle Code section 10851(a) and also convict him of receiving stolen property.  Defense counsel did not make any such argument to the jury.

Yasaroglu argues that because the trial court instructed the jury with CALCRIM No. 3515, this case is distinguishable from *Garza*, *supra*, 35 Cal.4th 866 so that the federal harmlessness standard applies.  CALCRIM No. 3515, as given to the jury, provides:  "Each of the counts charged in this case is a separate crime.  You must consider each count separately and return a separate verdict for each one."  Yasaroglu does not otherwise challenge the giving of that instruction as improper.  Nor does he explain how the giving of the instruction distinguishes this case from *Garza* so that the federal harmlessness standard applies.

Applying *Garza* to determine whether the trial court's failure to instruct the jury with CALCRIM No. 3516 "caused prejudice to defendant amounting to a miscarriage of justice, we ask whether it is reasonably probable that a properly instructed jury would have reached a result more favorable to defendant by not convicting him of violating both [Vehicle Code] section 10851(a)" and Penal Code 496d(a).  (*Garza*, *supra*, 35 Cal.4th at p. 882.)

It is not reasonably probable that a properly instructed jury would have reached a different result.  As to the taking, Victor reported to two law enforcement officers that he suspected that Yasaroglu had taken his car and that Yasaroglu did not have permission to take the car.  Victor also reported that Yasaroglu could have retained a car key that he

16

obtained when the two men lived together. In addition, Victor had requested a restraining order within the prior year because Yasaroglu had allegedly stolen his car, and Victor sent Yasaroglu a certified letter two months earlier stating that Yasaroglu did not have permission to take the car.

As to the posttheft driving, law enforcement found Yasaroglu asleep in the car on the side of the freeway about four days after Victor discovered the car missing, three days after Victor called Yasaroglu and demanded that he return the car, and two days after Victor reported the car stolen. Given that timeline, the theft of the car must have been completed long before Yasaroglu drove the car on the freeway, and it is not reasonably probable that a properly instructed jury would have reached a contrary conclusion. (See *Garza*, *supra*, 35 Cal.4th at p. 882.) Moreover, given that Yasaroglu's only defense was that he did have permission to take and to drive the car, and given that the jury convicted him on all counts and thus found that he did not have permission, it is not reasonably probable that a properly instructed jury would have convicted him of theft but not posttheft driving. Thus, under *Garza*, "we may uphold both convictions by construing defendant's conviction under [Vehicle Code] section 10851(a) as a nontheft conviction for posttheft driving." (*Ibid.*)

Yasaroglu argues for a contrary conclusion on the basis of the prosecution's opening statement and closing argument. He argues that "the prosecution in this case proceeded most unambiguously on a theft theory," so the jury necessarily convicted

17

Yasaroglu of taking the vehicle and not posttheft driving. The argument mischaracterizes the record.

The prosecutor's opening statement and closing argument did not advance one theory over the other. In the opening statement, the prosecutor initially told the jury: "We are here today because in August of 2017—August 6th and 7th—the defendant, [Yasaroglu], stole [Victor's] vehicle without his permission." The prosecutor also did not explain to the jury that Vehicle Code section 10851(a) could be violated by either theft or posttheft driving. But the prosecutor did explain to the jury that there were two distinct phases of the offense, the theft of the car on August 6 or 7 and Yasaroglu's being found in the car on August 11 after having refused Victor's request to return it. As to Yasaroglu's conduct on August 11, the prosecutor explained that Yasaroglu admitted to Officer Moran that he was driving the car to a friend's house "multiple days later, after he's been called, after he's been notified in writing, after it's been reported stolen." Moreover, the prosecutor argued that there was "overwhelming" evidence that Yasaroglu "did not have permission to have the vehicle, that he had taken the vehicle, and that he knew it was stolen when [he] was possessing it."

In sum, although the prosecutor did not explain that the taking and posttheft driving constituted separate ways of violating Vehicle Code section 10851(a), the prosecutor described the distinct conduct supporting each theory. The record therefore does not support Yasaroglu's contention that the prosecutor advanced only the theft theory of the offense.

For all of the foregoing reasons, Yasaroglu's argument fails. "[I]t is not reasonably probable that a properly instructed jury would have found defendant guilty of violating [Vehicle Code] section 10851(a) by stealing the car but not by posttheft driving." (*Garza*, *supra*, 35 Cal.4th at p. 882.)

C. *Ability to Pay Hearing*

Yasaroglu was sentenced in September 2019, nine months after the publication of *People v. Dueñas* (2019) 30 Cal.App.5th 1157. The trial court imposed a minimum $300 restitution fine (Pen. Code, § 1202.4, subd. (b)), a $120 court operations fee (Pen. Code, § 1465.8, subd. (a)(1)), and a $90 court facilities fee (Gov. Code, § 70373, subd. (a)(1)). Defense counsel did not object.

Yasaroglu argues that counsel's failure to object amounted to ineffective assistance of counsel. Assuming for the sake of argument that counsel's performance fell below an objective standard of reasonableness, Yasaroglu cannot carry his burden of demonstrating that "counsel's deficient performance was prejudicial, that is, there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301; *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.) Victor testified that Yasaroglu promised to repay him $850,000 when the trial concluded. In light of the uncontradicted evidence that Yasaroglu had access to such a large sum of money, it is not reasonably probable that the trial court would have declined to impose $510 in fines and fees had counsel objected that Yasaroglu did not have the ability to pay the amount.

19

D. *Other Costs*

The trial court also imposed a $514.58 booking fee (Gov. Code, § 29550), the monthly cost of probation supervision ranging from $16.42 to $104 to be determined by the probation department (Pen. Code, § 1203.1b), and the cost of the presentence probation report also to be determined by the probation department and not to exceed $1,095 (Pen. Code, § 1203.1b). While this appeal was pending, Assembly Bill No. 1869 (2019-2020 Reg. Sess.) (Assembly Bill 1869) added section 1465.9 to the Penal Code and section 6111 to the Government Code. (Stats. 2020, ch. 92, §§ 11, 62.) Those statutes provide that on and after July 1, 2021, the unpaid balance of any costs imposed under Penal Code section 1203.1b and Government Code section 29550 shall be "unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Pen. Code, § 1465.9, subd. (a); Gov. Code, § 6111, subd. (a).) The effective date has passed. The People concede that Assembly Bill 1869 applies after the effective date because Yasaroglu's judgment is not yet final.

"When the Legislature has not made its intent clear about whether a criminal statute operates prospectively or retroactively, we presume that the statute applies prospectively." (*People v. Zamora* (2019) 35 Cal.App.5th 200, 207 (*Zamora*).) When a statutory enactment lessens the punishment for a crime, we presume that the statute applies retroactively to all nonfinal judgments of conviction absent evidence of a contrary legislative intent, such as an express savings clause providing only prospective relief. (*In re Estrada* (1965) 63 Cal.2d 740, 745; *Zamora*, *supra*, at p. 207.)

20

Neither section 1465.9 to the Penal Code nor section 6111 to the Government Code contains a savings clause, nor is there an express indication that the statutes apply prospectively or retroactively. The statutes also contain no indicia of legislative intent concerning their application to cases not yet final on appeal. (See Stats. 2020, ch. 92, §§ 11, 62.) We therefore conclude that Assembly Bill 1869 applies retroactively to this case because the judgment was not final on the effective date. (See *Zamora*, *supra*, 35 Cal.App.5th at p. 207.)

We vacate the portion of the judgment imposing the booking fee (Gov. Code, § 29550), the probation supervision fee (Pen. Code, § 1203.1b), and the presentence report fee (Pen. Code, § 1203.1b).

E. *Probation Term*

Effective January 1, 2021, Assembly Bill No. 1950 (2019-2020 Reg. Sess.) (Stats. 2020, ch. 328, § 2) (Assembly Bill 1950) amended Penal Code section 1203.1 so that the maximum term of probation for most felonies shall not exceed two years. (Pen. Code, § 1203.1, subds. (a), (m).) Yasaroglu argues that the change in the law applies retroactively to defendants like him whose sentences were not final when Assembly Bill 1950 became effective. The People concede the point. We agree with those courts that have already held that Assembly Bill 1950 affected an ameliorative change in the law that applies retroactively to those like Yasaroglu whose sentences were not final when Assembly Bill 1950 became effective. (See *People v. Sims* (2021) 59 Cal.App.5th 943, 958-964; *People v. Quinn* (2021) 59 Cal.App.5th 874, 879-884; *People v. Burton* (2020)

21

58 Cal.App.5th Supp. 1, 15-16; *People v. Stewart* (2021) 62 Cal.App.5th 1065, 1070-1074, review granted June 30, 2021, S268787; *People v. Schulz* (2021) 66 Cal.App.5th 887, 893-895; *People v. Lord* (2021) 64 Cal.App.5th 241, 244-246.)

Moreover, we conclude that Yasaroglu is entitled to the benefit of Assembly Bill 1950 because his felony convictions are not listed among those specifically excluded from the reduction (Pen. Code, §§ 1203.1, subd. (m)(1)-(2), 667.5, subd. (c)), and the statutes under which he was convicted do not prescribe "specific probation lengths" (Pen. Code, §§ 1203.1, subd. (m)(1), 496d(a), 1170, subd. (h); Veh. Code, § 10851(a)).

The parties disagree about the appropriate remedy. Yasaroglu argues that we should reduce his probation from three years to two years, but the People contend that we instead should remand the matter to the trial court for resentencing. The People argue that "[m]erely striking any portion of the probationary term that exceeds two years deprives the superior court and the parties of a necessary determination of the status of the probation." The argument assumes that Yasaroglu could continue to serve a term of probation. But the court sentenced Yasaroglu to three years probation on September 6, 2019, so the new two-year maximum probation period ended on September 6, 2021 (before this opinion was filed). Yasaroglu cannot be ordered to serve any additional probation period. Under these circumstances, we perceive of no useful purpose that would be served by remand. We consequently modify the order placing Yasaroglu on probation to reduce the term of probation from three years to two years.

## DISPOSITION

The portion of the judgment imposing the booking fee (Gov. Code, § 29550.2), the probation supervision fee (Pen. Code, § 1203.1b), and the presentence report fee (Pen. Code, § 1203.1b) is vacated. We modify the order granting probation by reducing the term from three years to two years. We direct the trial court to correct the sentencing minute order to reflect the vacated fees and the imposition of a two-year term of formal probation, and to notify the appropriate probation department of the change to Yasaroglu's probationary term. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ           
J.

We concur:

McKINSTER           
           Acting P. J.
FIELDS           
           J.